PATRICIA LECK et al., Plaintiffs-Appellees, v. RONALD MICHAELSON, Director, Illinois State Board of Elections et al., Defendants-Appellants.

First District (2nd Division)   No. 83—3000

Opinion filed December 18, 1984.—Rehearing denied January 16, 1985.

Neil F. Hartigan, Attorney General, of Springfield, and David A. Epstein and Gary A. Weintraub, both of Chicago (James Scanlon and James Tenuto, Special Assistant Attorneys General, of counsel), for appellant Ronald Michaelson.

Richard M. Daley, State's Attorney, of Chicago (Joseph L. Ponsetto, Assistant State's Attorney, of counsel), for appellant Stanley Kusper.

Law Office of Edward J. Hanley, of Lansing, for appellants Louis La Mourie, John W. Eggert, and Marguerite L. Kelsven.

Gorman & Gorman, of Chicago (Gregory X. Gorman and H. Candace Gorman, of counsel), for appellees.

JUSTICE PERLIN delivered the opinion of the court:

This case presents constitutional issues of first impression relating to Illinois election law. Plaintiffs are voters residing in the village of Lansing (village). Plaintiff Leck was also a candidate for the office of village trustee in the 1983 village election. Defendants Malkas, Eggert and Kelsven were likewise candidates for village trustee in that election. Plaintiffs brought this action in the Cook County circuit court, requesting the court to direct the village to conduct a runoff election for the office of trustee, pursuant to the provisions of village ordinance No. 539 (the ordinance).[1]

Defendants argued that no runoff election should be held. They urged the trial court to hold the ordinance invalid on the ground that the village—a home rule unit— was without authority to enact such ordinance because the 1970 Illinois Constitution made the regulation of election procedures a State, not a home rule, function. Defendants claimed that the ordinance conflicted with controlling State statutes. Defendants also contended that the ordinance was invalid because it had not been "approved by referendum" within the meaning of the Constitution.

The record presents the following facts. In April 1979, the village held a referendum on the proposition:

> "Shall a run-off election be held for any candidates for public office in the Village of Lansing who do not receive fifty percent (50%) of the votes cast for that office."

The proposition carried. Thereafter, the village board drafted and, in July 1979, passed the ordinance which purported to "implement" the referendum proposition. Defendant Mayor La Mourie vetoed the ordinance. The village board overrode the mayor's veto, and the ordinance took effect in September 1979.

The ordinance, some five pages in length, requires that in order to be elected to the position of village president, clerk or trustee, a

---

[1]Plaintiffs initially filed this action in the United States District Court, where it was dismissed by Judge Roszkowski on abstention grounds. The court noted that this case presented State constitutional issues of first impression and recognized its potential impact on Illinois election law. Leck v. Michaelson, No. 83 C 2823, N.D. Ill., May 26, 1983.

candidate must "receive fifty percent of the votes cast at an election held for those respective offices ***." If the office is not won by a candidate with at least 50% of the vote, the ordinance calls for a run-off election to determine the winning candidate.[2]

Runoff elections are scheduled by the ordinance for "4 weeks after the regular municipal election." In a section entitled "Procedures for Conducting a Run-off Election," the ordinance addresses such items as the time polls will be open; determining tie votes; ballots; publication of notices; candidate ballot positions; and prohibits the replacement of a candidate who withdraws from a runoff election.[3]

In April 1983, election was held for several village offices, including three village trustee positions. Eight candidates vied for the three trustee seats. "Ballot applications" were filed by 3,516 voters. Each voter was entitled to cast three non-cumulative votes for trustee candidates. Thus, the maximum possible number of votes which could be cast for trustee candidates was 10,548 (three votes by each of the 3,516 voters). The number of votes actually cast for trustee candidates was 9,702, as follows:

---

[2]With respect to the office of village trustee, the ordinance provides:

"*Section 4*: In the event that all, or some, of the candidates for the office of Village Trustee do not receive fifty (50) percent of the votes cast at the election for that office, then a run-off election will be conducted, as is hereafter provided, as follows:

(a) If none of the candidates for Village Trustee receive fifty (50) percent of the votes cast at the election for that office, then a run-off election will be conducted among the candidates who receive the largest number of votes cast at the regular municipal election, not to exceed two (2) candidates for each office to be filled. The candidates receiving the highest number of votes in that election for the number of offices available shall be elected to the office of Trustee.

(b) If one or more of the candidates for Village Trustee receives fifty (50) percent of the votes cast at the election for that office, any such candidate shall be elected to the office of Trustee. If there are any candidates not elected, and if any offices for Trustee remain unfilled, then a run-off election will be conducted among the remaining candidates who receive the largest number of votes cast at the regular municipal election, not to exceed two (2) candidates for each office to be filled. The candidates receiving the highest number of votes in that election for the number of offices available shall be elected to the office of Trustee."

[3]The facts presented to the trial court and to this court are woefully sparse. For example, the ordinance provides: "Rules, regulations and ordinances of the Village of Lansing which apply to regular municipal elections shall also apply to any run-off election in the Village of Lansing." However, such rules, regulations and ordinances are not contained in the record.

| | |
|---|---|
| Eisha . . . . . . . . . . . . . . . . . . . . . . | 1,821 |
| Eggert. . . . . . . . . . . . . . . . . . . . | 1,617 |
| Kelsven . . . . . . . . . . . . . . . . . . | 1,303 |
| Leck. . . . . . . . . . . . . . . . . . . . . | 1,266 |
| Malkas . . . . . . . . . . . . . . . . . . . | 1,203 |
| Imes. . . . . . . . . . . . . . . . . . . . . | 854 |
| Swansey . . . . . . . . . . . . . . . . . | 845 |
| Substalea. . . . . . . . . . . . . . . . . | 793 |

Pursuant to certification of the above vote totals, candidates Eisha, Eggert and Kelsven were declared to be the elected trustees, and they were sworn into office.

Plaintiffs then instituted this action, alleging that the ordinance mandated a runoff election because none of the trustee candidates had received 50% of the "votes cast at the election for that office."

The case was presented to the trial court on the pleadings, memoranda of law and stipulated facts. In a memorandum decision, the trial court held that under its home rule power the village had authority to establish the 50% majority requirement for election; to prescribe the runoff election system to effect the 50% majority; and to schedule runoff elections four weeks after the "regular" village election, notwithstanding the fact that such schedule conflicted with the "consolidated election schedule" in the State Election Code. The trial court held invalid those provisions of the ordinance which purport to establish "Procedures" for conducting a runoff election, holding that these aspects of election law are controlled by State statute. The court also upheld the referendum procedure whereby the ordinance was "approved" by the village voters, even though the court noted that "certain provisions of the ordinance are outside the authorization of the referendum."

Applying the ordinance to the 1983 village trustees election, the trial court determined that the number of "votes cast" for the office of trustee was 3,516 (the number of voters who requested ballots at the election) and on that basis found that only candidate Eisha had garnered the necessary 50% majority. The court ordered defendants Eggert and Kelsven removed from office, and directed that a runoff election for the resultant two trustee vacancies be held between the four remaining candidates with the highest vote totals. The court also denied plaintiffs' request for attorney fees and stayed its order pending this appeal.

Defendants appeal from those portions of the court's order which upheld sections of the ordinance and the village's referendum procedure. Plaintiffs cross-appeal from the denial of their request for attor-

ney fees.

Resolution of the issues raised in this case compels consideration of several provisions of the 1970 Illinois Constitution. The concept of home rule delineated in the 1970 Constitution altered drastically the relationship between State and local governments. Previously, local governments were limited to the exercise of only those powers granted to them by the General Assembly. Now, home rule units are granted wide autonomy in the conduct of their government and affairs. To accomplish such independence, the Constitution accorded substantial authority to home rule units, subject only to the restrictions imposed or authorized in the Constitution. See *Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 290 N.E.2d 240.

We consider first the validity of the village ordinance.

## I
### THE ORDINANCE

We find distinct those provisions of the ordinance which (A) establish a 50% majority vote requirement for election to village office and a runoff election system to implement such requirement; and (B) those provisions which set the runoff election schedule and define the runoff election "procedures."

## A

■ We agree that the village of Lansing, as a home rule unit, is empowered to establish a 50% majority vote requirement for election to village office, and to adopt a runoff election system to achieve such requirement. Article VII, section 6(f), of the Constitution provides, in part:

> "A home rule municipality shall have the power to provide for its officers, *their manner of selection* and terms of office only as approved by referendum or as otherwise authorized by law." (Emphasis added.)

In *Boytor v. City of Aurora* (1980), 81 Ill. 2d 308, 410 N.E.2d 1, the Illinois Supreme Court held that "the power to choose the 'manner of selection' should include the ability to decide by referendum whether the election of officers should be on a partisan or nonpartisan basis." (81 Ill. 2d 308, 314.) We believe that this constitutional provision includes also the ability to decide that officers should be elected by a 50% majority, and to establish a runoff election system to effect the 50% majority requirement. We hold therefore that these provisions of the ordinance are within the village's home rule authority.

## B

We find that the remaining provisions of the ordinance—which govern the schedule and procedures for the runoff elections—give rise to a different conclusion. Article VIII, section 6(a), of the Constitution provides, in part:

"Except as limited by this Section, a home rule unit may exercise any power and perform any function *pertaining to* its government and affairs ***." (Emphasis added.)

Article VII, section 6(m), mandates that "[p]owers and functions of home rule units shall be construed liberally." Plaintiffs maintain that the regulation of procedures and schedules for local elections "pertains to" Lansing's government and affairs. Defendants respond that the Constitution makes election laws and voting procedures a State, not a home rule, function.

The Illinois Supreme Court has said that the phrase "pertaining to" limits the scope of home rule powers.

"The late Professor David C. Baum, counsel to the convention's local government committee, stated that the most general and uncertain limitation upon home rule power is found in the language of the home rule grant itself. *** '[T]he question is not whether the "pertaining to ***" language should limit the home rule grant, but rather how extensive the limitation should be.'

The local government committee, explaining the intended extent of this limitation, stated in its report to the constitutional convention, 'It is clear, however, that the powers of home rule units relate to their own problems, not to those of the state or the nation. *** Thus the proposed grant of powers to local governments extends only to matters "pertaining to their government and affairs." ' [Citation.]" *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540, 338 N.E.2d 15.

Whether a particular power or function is one accorded to home rule units is to be determined by the courts. (*Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 338 N.E.2d 15.) The question, therefore, is whether under our constitution the power to schedule elections and to enact election procedures "pertains to" local government and affairs or belongs to the State. In resolving similar conflicts, the supreme court has examined other constitutional provisions. Where the Constitution establishes statewide policy or gives jurisdiction over a subject to the General Assembly, the court has found home rule authority to be restricted, or denied.

In *Ampersand,* the court struck down a home rule ordinance

which sought to impose a $2 filing fee in civil court cases. The court held that a home rule unit was without authority to so act because article VI of the Constitution created a single statewide unified court system, which established "the dominant interest which the State has in the administration of justice." *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 543. See also *City of Carbondale v. Yehling* (1983), 96 Ill. 2d 495, 451 N.E.2d 837.

In *Bridgman v. Korzen* (1972), 54 Ill. 2d 74, 295 N.E.2d 9, the court held invalid a home rule ordinance enacted by the board of commissioners of Cook County purporting to authorize Cook County to collect property taxes in four installments instead of two. "We find no provision in the constitution of 1970 or in the proceedings of the [constitutional] convention which leads us to believe that the collection of property taxes is a home-rule power or function ***." (54 Ill. 2d 74, 78.) In *Board of Education v. City of Peoria* (1979), 76 Ill. 2d 469, 476, 394 N.E.2d 399, the court held that article X, section 1, of the Constitution granted the State "plenary power over the Illinois school system" and, on that basis struck down the application of a city tax to school districts because such would "constitute an unauthorized regulation of the school district" by a local government. 76 Ill. 2d 469, 476, 477.

In *County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 389 N.E.2d 553, the court held that because article IX of the Constitution provides that the "public policy of the State" is to provide a "healthful environment" and the "General Assembly shall provide by law for the implementation and enforcement of this public policy," the State had primary authority over environmental matters and therefore any legislation by local governments must "conform" to the standards set by the State. In *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480, 368 N.E.2d 100, the court held invalid a home rule ordinance which in effect authorized branch banking. The court held that under article XIII, section 8, of the Constitution, "only the General Assembly may make branch banking possible ***." 67 Ill. 2d 480, 485.

On the other hand, in upholding the city's authority to enact a comprehensive landlord-tenant ordinance in *City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 110, 421 N.E.2d 196, the court found no "constitutional mandate in the realm of landlord-tenant relationships" which would bar the city from exercising that power.

With respect to the regulation of election laws and procedures, article III, section 4, of the Constitution (the uniformity clause) provides:

"The General Assembly by law shall define permanent residence for voting purposes, insure secrecy of voting and the integrity of the election process, and facilitate registration and voting by all qualified persons. *Laws governing voter registration and conduct of elections shall be general and uniform.*" (Emphasis added.)

The constitutional convention proceedings indicate that the drafters considered the regulation of election procedures to be a statewide, not a local, concern. The report of the convention's Committee on Suffrage and Constitutional Amending notes:

"The requirement that the laws be general and uniform reflects the committee's judgment that voting is properly a subject of state interest in the first instance, and therefore the laws relating thereto should be statewide in application. *** Areas where the principle of general and uniform laws would seem to have particular application, in the view of some of the witnesses who testified before the committee, would include *** [e]lection day procedures ***." 7 Record of Proceedings, Sixth Illinois Constitutional Convention 2353-55.

Professor Baum also has written that the uniformity clause demonstrated that the enactment of election laws was not to be a function of home rule units.

"Actually, a fourth area of control over municipal structure is found in section 4 of Article III, Suffrage and Elections. That section requires the General Assembly to regulate elections by general and uniform election legislation. Election laws therefore seem to fall entirely within the jurisdiction of the legislature rather than that of home rule units or their voters." Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations*, 1972 U. Ill. L.F. 137, 146 n.37.

Further indication that the framers intended the regulation of elections to be a power reserved to the State is found in article III, section 5, of the Constitution which provides, in part:

"A State Board of Elections shall have general supervision over the administration of the registration and election laws throughout the state."

The Illinois Supreme Court has stated that the uniformity clause "refers to the mechanics of voter registration, residency requirements and other election and voting procedures." *Totten v. State Board of Elections* (1980), 79 Ill. 2d 288, 295, 403 N.E.2d 225.

We conclude that under our constitution the power to regulate elections is reserved to the State; and actions in this area by local

governments must conform with State law.

The General Assembly has enacted general and uniform election laws. Between 1977 and 1980 the General Assembly, in a series of amendatory enactments collectively referred to as the election consolidation legislation (ELCO), revised the State Election Code (Ill. Rev. Stat. 1981, ch. 46) and amended and repealed various election statutes found in other acts. ELCO created a comprehensive election system which coordinated the laws, scheduling, procedures and administration for all elections to be held in this State. Section 1—1 of the Election Code provides:

> "This Act shall be known and may be cited as The Election Code. This Act is the general law of Illinois and any reference in any other Act to 'the general election law' or 'the general election law of this State' is a reference to this Act, as now or hereafter amended." Ill. Rev. Stat. 1983, ch. 46, par. 1—1.[4]

The Election Code addresses, *inter alia*, the scheduling of all Illinois elections (art. 2A); qualifications of voters (art. 3); registration of electors (arts. 3, 4, 5 and 6); nominations by political parties (art. 7); the making of campaign contributions and campaign expenditures (art. 9); ballots and ballot boxes (arts. 15 and 16); conduct of elections (arts. 17 and 18); canvassing votes (art. 22); contesting election results (art. 23); voting systems (arts. 24 and 24A); and the submission of public questions to voters (art. 28).

■ With regard to the scheduling of elections, section 2A—1 of the Election Code provides, in relevant part:

> "(a) No public question may be submitted to any voter in this State, nor may any person be nominated for public office or elected to public office or political party office in this State except pursuant to this Code, notwithstanding the provisions of any other statute or municipal charter ***.
>
> (b) All elections in this state shall be held in accordance with the consolidated schedule of elections established in Sections 2A—1.1 and 2A—1.2. No election may be held on any date other than a date on which an election is scheduled under Section 2A—1.1 ***." Ill. Rev. Stat. 1983, ch. 46, par. 2A—1.

The Election Code provides for a "consolidated schedule" of five elections each biennium; two in even-numbered years (a "general pri-

---

[4]ELCO resulted in major revisions to the election provisions of the Illinois Municipal Code (Ill. Rev. Stat. 1983, ch. 24, par. 1—1—1 *et seq.*). Section 3—2—2 therein provides in part: "The schedule, manner of conducting, voting at, and contesting municipal elections shall be as provided in the general election law [*i.e.*, the Election Code]." Ill. Rev. Stat. 1983, ch. 24, par. 3—2—2.

mary" and "general election") and three in odd-numbered years (a "consolidated primary" in February; "consolidated election" in April; and a "non partisan election" in November. (See section 2A—1.1 of the Election Code.)[5] Municipal elections are held in odd-numbered years. We find that the consolidated election schedule does not allow for the village of Lansing to schedule an "extra" runoff election "4 weeks after the regular municipal election."[6]

While we have no quarrel with the authority of the village of Lansing to require candidates to receive a 50% majority vote in order to be elected, and a runoff election system to implement that requirement, such system must be effectuated in conformance with the State

---

[5]Previous court decisions have required local governments to adhere to the consolidated election schedule. *Korte-Reinheimer v. City Council* (1981), 94 Ill. App. 3d 219, 418 N.E.2d 783; *Chicago Ridge Park District v. Oak Lawn Park District* (1983), 112 Ill. App. 3d 364, 445 N.E.2d 494.

[6]With reference to the Election Code's schedule for municipal elections, section 2A—1.2 provides in part:

"(c) At the consolidated election in the appropriate odd-numbered years, the following offices shall be filled:

(1) Municipal officers, provided that in municipalities in which candidates for alderman or other municipal office are not permitted by law to be candidates of political parties, the runoff election where required by law, or the nonpartisan election where required by law, shall be held on the date of the consolidated election; and provided further, in the case of municipal officers provided for by an ordinance providing the form of government of the municipality pursuant to Section 7 of Article VII of the Constitution, such officers shall be filled by election or by runoff election as may be provided by such ordinance;

\* \* \*

(d) At the consolidated primary election in each odd-numbered year, candidates of political parties shall be nominated for those offices to be filled at the consolidated election in that year, except where pursuant to law nomination of candidates of political parties is made by caucus.

At the consolidated primary election in the appropriate odd-numbered years, aldermen shall be elected in municipalities in which candidates for alderman are not permitted by law to be candidates of political parties, subject to runoff elections to be held at the consolidated election as may be required by law, and municipal officers shall be nominated in a nonpartisan election in municipalities in which pursuant to law candidates for such office are not permitted to be candidates of political parties.

At the consolidated primary election in the appropriate odd-numbered years, municipal officers shall be nominated or elected, or elected subject to a runoff, as may be provided by an ordinance providing a form of government of the municipality pursuant to Section 7 of Article VII of the Constitution."

election schedule and election procedures.[7]

In view of our disposition of this case, we do not reach the argument of the State Election Board that even if it were found that home rule powers included authority over local election laws and procedures, the General Assembly's enactment of the aforestated election statutes resulted in an implied "pre-emption" of such home rule power.[8]

There remains the question of whether the invalidity of some portions of the ordinance render the entire ordinance invalid. While the ordinance here contains a severability clause, its presence is not controlling.

> "Although the ordinance contains a severability clause, its presence is not necessarily conclusive as to whether the remainder of the ordinance can stand. [Citation.] * * *.
>
> As stated by this court, the general test in determining whether an invalid part of a statute is severable so that the remainder of the statute may stand is as follows: 'If what remains after the invalid portion is stricken is complete in itself and capable of being executed wholly independently of that which is rejected, the invalid portion does not render the entire section unconstitutional unless it can be said that the General Assembly would not have passed the statute with the invalid portion eliminated.' [Citations]." *Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 73, 432 N.E.2d 227.

---

[7]As a practical matter, it appears that the village could effectuate its runoff election system within the present consolidated election schedule. For example, the village could eliminate the use of the February "consolidated primary" date for party primaries by adopting either a nonpartisan format or by retaining the partisan format but substituting party caucuses for primaries. The village could then use the February election date for its general election and the April "consolidated election" date for any required runoff election. Such actions seem consistent with the applicable State statutes. See, *e.g., Boytor v. City of Aurora* (1980), 81 Ill. 2d 308, 410 N.E.2d 1.

[8]We note, however, our disagreement with the premise of the State Election Board that every action by the State in a given area connotes its automatic pre-emption of all home rule powers in that area. Article VIII, section 6(h), allows the General Assembly to "provide *specifically* by law for the exclusive exercise by the State" of home rule powers. Section 6(i) of the same Article allows home rule units to exercise concurrently with the State any home rule function "to the extent that the General Assembly does not *specifically* limit the concurrent exercise" of such power or "*specifically* declare the State's exercise to be exclusive." (Emphasis added.) Thus, contrary to the Board's contention, we believe the Constitution requires that pre-emption of home rule powers by the State must be explicitly set forth, not merely inferred by the courts. See *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d 523, 343 N.E.2d 919.

■ In the instant case we believe that the valid portions of the ordinance (establishing the 50% majority requirement and runoff election system) may be severed from the invalid portions. We therefore uphold those provisions. Section 5 of the ordinance, which sets forth the runoff election schedule and procedures, is invalid due to its conflict with the State Election Code.

Defendants next contend that the trial court erred in the manner in which it applied the 50% majority requirement to the 1983 village trustees' election. We agree.

As noted, the ordinance provides that election to village office requires that candidates "must receive fifty (50) percent of the votes cast at an election held for those respective offices." With reference to trustees, the ordinance states that "in the event that all, or some, of the candidates for the office of Village Trustee do not receive fifty (50) percent of the *votes cast* at the election held for that office, then a runoff election shall be conducted ***." (Emphasis added.) In defining the 50% majority the trial court did not consider the number of "votes cast" but considered instead the number of persons who requested ballots at the election. However, the ordinance requires that the "votes cast," not the number of voters, be employed to determine whether a candidate has reached the 50% majority.

In single-office elections (such as for the office of mayor or clerk), the 50% requirement is easily determined; the total votes tallied by all of the candidates for that office are added together and divided by two. In multiple-office field elections, the same method of determining the 50% mark cannot be used. In the trustees' election eight candidates vied for three trustee offices; each candidate competes with all of the other candidates for *any* of the three offices. There is no distinct vote for any specific trustee's office; all of the votes are commingled. There is thus no way to identify the votes cast for any specific office.

■ We believe that the only manner in which the intent of the Lansing referendum and ordinance may be realized in multi-office field elections is to determine the average vote cast for each office in issue. Thus, by adding the total number of votes cast for all trustee candidates (here, 9,702) divided by the number of offices to be filled (here, three) results in the average vote actually cast for each trustee's office to be filled (here, 3,234). Dividing that number by two results in a number reflecting 50% of the average vote for each office to be filled (here, 1,617). While this is an averaging technique, we believe that in the absence of a more specific workable method, it is the only tallying procedure which is practical, feasible and analogous to the 50% calculation employed in single-office elections.

By this method of calculation, both candidates Eisha and Eggert

received the 50% majority vote for election to village trustee. We hold, therefore, that candidate Kelsven failed to gather the 50% majority required, and that a runoff election need be held for the remaining trustee vacancy between the two candidates with the highest vote totals: Kelsven and Leck.

## II

### THE REFERENDUM

Defendants contend that irrespective of the authority of the village to enact an ordinance of the character of No. 539, it should be held invalid because it was not "approved by referendum" as required by the Constitution. Article VII, section 6(f) (the referendum clause), provides, in part:

> "A home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office *only as approved by referendum* or as otherwise authorized by law."[9] (Emphasis added).

The referendum proposition approved by the village voters here was:

> "Shall a run-off election be held for any candidates for public office in the Village of Lansing who do not receive fifty percent (50%) of the votes cast for that office."

Defendants contend that the voters only "approved" the concepts of a 50% majority requirement and a runoff election system. To the extent that the ordinance subsequently enacted includes other provisions, they claim the requisite voter approval was not obtained. Defendants posit that the referendum clause requires that an ordinance needing voter approval be first drafted and then submitted to the voters at a referendum and not, as here, a situation where the voters initially approve a concept from which an "implementing" ordinance is then fashioned.[10] Because we hold that these allegedly "unapproved" provisions of the ordinance are invalid as beyond the scope of home rule powers, we do not address the issue of whether these same provisions are in-

---

[9]It should be noted that these referendum powers have been granted to all municipalities; both home rule (art. VII, sec. 6(f)) and non-home-rule (art. VII, secs. 7(2) and (3)) and to all counties, whether home rule or non-home-rule (art. VII, sec. 4(c)). See *Pechous v. Slawko* (1976), 64 Ill. 2d 576, 357 N.E.2d 1144.

[10]Defendants' concern with the ramifications of referenda procedures which initially "approve" a concept which is subsequently "fleshed out" in legislation, is bolstered by the instant case. While the Lansing referendum approved the two concepts involved, the ordinance resulted in other fundamental changes in the village structure. For example, the voters could not know at the time the referendum was acted upon that the subsequent ordinance would forbid the replacement of a candidate who withdrew from a runoff election.

valid also on the further ground that they were not approved in a manner consistent with the referendum clause of the Constitution.

## III
### ATTORNEY FEES

Plaintiffs cross-appeal from the trial court's denial of their request for attorney fees. Plaintiffs' request was made pursuant to the Federal Civil Rights Attorneys Fees Award of 1976 (42 U.S.C. sec. 1988). A trial court's determination with regard to the award of attorney fees will be disturbed on review only in the event the court is found to have abused its discretion. *Stein v. Feldmann* (1980), 85 Ill. App. 3d 973, 407 N.E.2d 768.

In *Caputo v. City of Chicago* (1983), 113 Ill. App. 3d 45, 446 N.E.2d 1240, this court held that:

"*** State courts should award attorney fees under 42 U.S.C. sec. 1988 (1976) only in the following instances: (1) where Federal statutory or constitutional law is the basis for a decision in favor of a claimant, or (2) where Federal law remains intimately involved in the case until a settlement or consent decree is entered into." (113 Ill. App. 3d 45, 48.)

We find that neither basis for an award of attorney fees under this statute is here present, and so we affirm the trial court's denial of fees.

Summarizing, we hold that the regulation of election procedures is, under the Illinois Constitution of 1970, a power granted to the State, and not to local governments. We therefore hold invalid those provisions of Lansing ordinance No. 539 which conflict with the election schedules and procedures set forth in the State Election Code. We hold that the village of Lansing is constitutionally empowered to require a 50% majority vote for election to village office, and to implement a runoff election system to effect the 50% requirement; those provisions of Lansing ordinance No. 539 so providing are upheld. We find that trustee candidates Eisha and Eggert received the requisite 50% majority, and were thus elected to the office of Lansing village trustee; candidate Kelsven did not receive the requisite 50%. Kelsven must therefore be removed from office, and a runoff election should be held for the remaining vacant trustee's office between Kelsven and Leck. We affirm the trial court's denial of attorney fees to plaintiffs.

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion.

HARTMAN, P.J., and DOWNING*, J., concur.

---

*JUSTICE DOWNING participated in the decision of the above-captioned case before the expiration of his term in office.